19096

Troy DUCKWORTH, Respondent, v. The FIRST NATIONAL BANK of South Carolina, Appellant

(176 S. E. (2d) 297)

*Messrs. Boyd, Bruton, Knowlton & Tate,* of Columbia, *for Appellant,*

*Messrs. Cromer, Louthian & Meeting,* of Columbia, *for Respondent,*

August 20, 1970.

Moss, Chief Justice:

Troy Duckworth, the respondent herein, instituted this action against the First National Bank of South Carolina,

the appellant herein, to recover damages on account of certain alleged slanderous words spoken of and concerning him by an officer of the appellant.

The case came on for trial before The Honorable John Grimball, and a jury, at the 1969 Term of the Court of Common Pleas for Richland County, and resulted in a verdict in favor of the respondent for actual and punitive damages.

At appropriate stages of the trial, the appellant made a motion for a directed verdict on the grounds that the only reasonable inference to be drawn from the testimony is, (1) that there was no publication by the appellant of the alleged slanderous statement; and (2) that the alleged slanderous statement was qualifiedly privileged and there was no proof of actual malice on the part of the appellant sufficient to destroy such privilege. After an adverse judgment the appellant moved for judgment *non obstante veredicto,* and, in the alternative, for a new trial, on the same grounds as were included in the motion for a directed verdict. The appellant filed a counterclaim against the respondent and sought to recover from him as an endorser on the worthless check in question in this case. It is also asserted by the appellant that it was error for the trial judge to refuse its motions for a directed verdict, for judgment *non obstante veredicto,* or, in the alternative, for a new trial, as to its counterclaim based upon the respondent's endorsement of the worthless check. All of these motions were refused and this appeal followed.

It appears from the testimony that in August, 1966, the respondent became the manager for a middle weight boxer named Tommy Fields. The respondent loaned Fields various sums of money from time to time, totalling $1,000.00. This sum was to be paid from a check Fields was to receive for participating in a European Prize Fighting Tour in which he had engaged prior to the respondent becoming his manager. The respondent was to be made a payee, along with

Fields, on the check to be received for such overseas fights. On April 13, 1967, a check was received purportedly drawn by "Sports Illustrated" on the Swiss Banking Corporation of Geneva, Switzerland, in the amount of $7,000.00, and payable to the respondent and Fields. This check was endorsed by Fields and the respondent and deposited for collection in the Bank of Augusta, Augusta, Georgia. Four weeks later the check was returned through normal banking routine to the Bank of Augusta with notations on the front and back thereof that the check had been dishonored and was "no good". The dishonored check was delivered to the respondent and, thereafter, in an effort to collect the check the respondent and Fields went to New York and presented the check to the Swiss Bank in Rockefeller Center. It was there dishonored and the payees were advised that the check was "no good". The respondent then delivered the check to Fields for disposition.

Fields engaged a Columbia attorney to collect the check. The attorney, on May 15, 1967, deposited the check, the same bearing the endorsement of the respondent and Fields, in his attorney account, and on May 25, 1967, he paid over from his account to Fields the sum of $6,600.00. Fields established a new account in his own name in the appellant bank. On May 31, 1967, in payment of his indebtedness to the respondent, Fields purchased from the appellant bank a cashier's check in the amount of $1,000.00 and delivered the same to the respondent. The respondent cashed the check at the Washington Street office of the appellant.

Subsequently, on or about June 12, 1967, the Swiss Bank check, in the amount of $7,000.00, was dishonored and returned to the appellant. Thereafter, on June 16, 1967, Roy S. McBee, an assistant vice-president of the appellant, called the respondent at his office in North Augusta, South Carolina, advising him that the check had been dishonored and demanding that he come to the bank in Columbia. The respondent testified that during the course of this conversa-

tion that McBee said: "We have a $7,000.00 check over here that you and Fields are trying to swindle us out of." And further said: "Well, you get over here or we will have you arrested over there." The respondent picked up Fields and came to Columbia on the same day. When the respondent arrived at the bank he inquired as to the whereabouts of Mr. McBee and was directed to his open cubicle-like office located at the rear of the bank lobby. The respondent testified that after he and Fields were seated in the office that McBee then made the alleged slanderous statement: "Who are you trying to swindle? What do you think you are trying to do?" And, "Who in the hell are you trying to swindle with a $7,000.00 worthless check?" The respondent testified that at the time the aforesaid statement was made that McBee was in a rage and "he kept shouting and hollering and going on and he got up in his chair and stood up behind his desk, * * *."

There is testimony that the appellant operates a large bank with many customers entering and leaving its lobby each day and the conversation between McBee and the respondent occurred on the day of the week of the heaviest customer traffic and at the busiest hour of that day. The respondent testified as to the presence of third parties in the bank at the time of the alleged slanderous statement made by McBee as follows:

"Q. Now, going back to the episode at the bank with Mr. McBee, were there customers around at all times within earshot of the conversation when it took place?

"A. Yes, there was.

"Q. Do you know whether or not they heard it?

"A. I know they did because they were looking, they couldn't help it.

"Q. Did you know any of the people that were there?
"A. No, sir. I don't know anyone in Columbia."

McBee denied making the alleged slanderous statement and speaking to the respondent in a loud and angry voice. He said that he did not notice any

people around his cubicle at the time of his conversation with the respondent. A teller, occupying a cage within two feet of the office of McBee, testified that she knew that the respondent and another person were in the office of McBee but that she did not overhear any of the conversation that took place between the parties nor did she notice anything unusual in connection with the conversation. There was also testimony given by a Mr. King, an assistant vice-president, who was present during a part of the conversation between McBee and the respondent, and he denied hearing the statement attributed to McBee by the respondent. There was a conflict of testimony as to whether the alleged slanderous statement was made and this was an issue properly submitted to the jury for determination.

It is the position of the appellant that the trial judge was in error in not concluding, as a matter of law, that no reasonable inference could be drawn from the evidence that there was a publication of the slanderous statement.

The burden of proof was upon the respondent to show not only that the statement was made, but that such was communicated or published to some third person. *Tucker v. Pure Oil Co.,* 191 S. C. 60, 3 S. E. (2d) 547. We held in *Tobias v. Sumter Telephone Company,* 166 S. C. 161, 164 S. E. 446, that publication of the slanderous statement may be established by the positive testimony of a person to the effect that the slanderous remarks were heard by him or,

"* * * by evidence tending to show that third persons were present and near enough at the time to hear the words spoken. And evidence of the latter class would be sufficient to take the case to the jury for them to say whether the words spoken were heard by the third person present, even though such person should deny having heard them."

In *Pelot v. Davison-Paxon Co.,* 218 S. C. 189, 62 S. E. (2d) 95, this court followed the rule announced in the *Tobias* case and held that when a third person

was present and could have heard the slanderous statements made, even though such third person denied hearing the statements, it became a question for the jury. In the instant case the respondent relied upon circumstantial evidence to prove the fact of publication. He testified that there were customers of the bank around at all times and near enough to hear what was said. Under the testimony in this case and the rule stated we do not think the trial judge erred in his refusal to hold, as a matter of law, that there was no publication of the slanderous statement. This question was properly submitted to the jury.

The appellant contends that the trial judge erred in failing to conclude, as a matter of law, that all statements made by the agent of the appellant were qualifiedly privileged and respondent failed to prove actual malice necessary to destroy such privilege. In *Conwell v. Spur Oil Co.,* 240 S. C. 170, 125 S. E. (2d) 270, we defined qualified privilege as follows:

"* * * A communication made in good faith on any subject matter in which the person communicating has an interest, or in reference to which he has a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which, without this privilege, would be actionable, and although the duty is not a legal one, but only a moral or social duty of imperfect obligation. The essential elements of a conditionally privileged communication may accordingly be enumerated as good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion, and publication in a proper manner and to proper parties only. The privilege arises from the necessity of full and unrestricted communication concerning a matter in which the parties have an interest or duty, and is not restricted within any narrow limits."

The appellant having pled the defense of qualified privilege, the burden was upon it to prove such by a preponderance of the evidence and if it is shown that the alleged slanderous statement was made upon a qualified

privileged occasion, this rebuts the inference of malice, and in order to overcome the defense of qualified privilege, the burden was upon the respondent to show express malice or malice in fact on the part of the appellant toward the respondent. *Cartwright v. Herald Publishing Co.*, 220 S. C. 492, 68 S. E. (2d) 415.

In the *Conwell* case we quoted from the case of *Rowell v. Johnson*, 170 S. C. 205, 170 S. E. 151, the following:

"In Newell on Slander and Libel (4th Ed.), 418, the writer says: 'But it must be remembered that although the occasion may be privileged, it is not every communication made on such occasion that is privileged. It is not enough to have an interest or duty in making a communication; the interest or duty must be shown to exist in making the communication complained of. A communication which goes beyond the occasion exceeds the privilege.'

"In 36 C. J., 1248, we find: 'The protection of the privilege may be lost by the manner of its exercise, although the belief in the truth of the charge exists. The privilege does not protect any unnecessary defamation. In order for a communication to be privileged, the party making it must be careful to go no farther than his interests or his duties require'."

The case of *Leevy v. North Carolina Mutual Life Ins. Co.*, 184 S. C. 111, 191 S. E. 811, was a slander action in which it appears that an agent of the insurance company stated to Leevy that he was a crook and a thief and was not straight in his business and such statements were made in the presence of a third person who was a customer of the plaintiff. The insurance company alleged that the words spoken were on a qualifiedly privileged occasion and asked for a directed verdict on this ground. The motion for a directed verdict was overruled and the issue was submitted to the jury. This court, in affirming the action of the trial judge, said:

"With reference to the defense of qualified privilege, it is well recognized that in order to recover it must appear from

the evidence that the language used was disproportioned in strength and violence to the occasion, or went beyond the exigency of the occasion, or that the occasion was abused to gratify the ill will of the defendant; in other words, that the defendant was acting from actual malice. Strong and violent language or insinuation disproportionate to the occasion may raise an inference of malice and thus lose the privilege which might otherwise attach to the occasion."

In *Jones v. Garner,* 250 S. C. 479, 158 S. E. (2d) 909, we held that a statement which abuses or goes beyond the requirement of the occasion loses the protection of the privilege.

In *Switzer v. American Ry. Express Co.,* 119 S. C. 237, 112 S. E. 110, this court quoted, with approval, from the case of *Sheftall v. Central of Ga. Ry. Co.,* 123 Ga. 589, 593, 51 S. E. 646, 648, the following:

"To make the defense of privilege complete * * * good faith, an interest to be upheld, a statement limited in its scope to this purpose, a proper occasion and publication in a proper manner and to proper parties only, must appear. The absence of any one or more of these constituent elements will, as a general rule, prevent the party from relying upon the privilege. All of these questions are, however, questions of fact for the jury to determine according to circumstances of each case under appropriate instructions from the court."

Assuming the occasion under consideration to have been one of qualified privilege, thereby providing the appellant with certain defeasible immunities regarding his utterances, it becomes a jury question to determine whether such immunities have been preserved by proper exercise of the privilege or lost by reason of abuse or employment of methods that go beyond the requirements of the occasion. There was no error in refusing the motion of the appellant and submitting the case to the jury. It was for the jury to say whether the communication exceeded the privilege in the light of the facts shown by the record.

It is the position of the appellant that the trial judge was in error in not concluding, as a matter of law, that the respondent was liable as an endorser on the worthless check in issue, or, in the alternative, was liable on the theory of unjust enrichment because the source of the $1,000.00 received by him was traceable to the worthless check drawn on the Swiss bank.

The testimony shows that the appellant took the check in question with notice and knowledge that such had already been dishonored by the Swiss bank, upon which it was drawn. The question arises as to whether the appellant was a holder in due course of the check. A holder in due course, under our negotiable instruments law, as is set out in Section 8-882 of the Code, is one who has taken the instrument under the following conditions:

"(1) It is complete and regular upon its face;

"(2) He became the holder of it before it was overdue and without notice that it had been previously dishonored, if such was the fact;

"(3) He took it in good faith and for value; and

"(4) At the time it was negotiated to him he had no notice of any infirmity in the instrument or defect in the title of the person negotiating it."

It being uncontradicted that the appellant took the instrument with notice that it had been previously dishonored, it cannot be a holder in due course. A holder not in due course takes the instrument subject to the same defenses as if it were non-negotiable. *Ives v. Rutland,* 135 S. C. 173, 133 S. E. 539; *Folk v. Felder,* 168 S. C. 103, 167 S. E. 27.

At the time the appellant accepted the check, it did so with full notice that it had been previously dishonored by the Swiss bank. There was a notation to this effect on the front and back of the check and this should have put the appellant on notice that it was receiving a check of questionable value. The appellant forwarded for collection the Swiss bank check through the International Department of the

Wachovia Bank & Trust Company of Winston-Salem, North Carolina. Prior to any advice that the check had been collected or payment refused, the appellant permitted the attorney who had deposited the check to his account to withdraw, in the form of a cashier's check, the sum of $6,600.00, and such was paid over to Fields who opened a checking and savings account in the appellant bank. The appellant then permitted Fields to withdraw from his checking account, such being represented by a cashier's check, the amount of $1,000.00, and such was delivered to the respondent, who, in turn, cashed the cashier's check at the bank of the appellant.

It will be noted from the circumstances that we have recited that the appellant bank had notice and knowledge that it had received a check of questionable value and, notwithstanding such fact, and prior to the time it had any notice that the check had been dishonored or paid, it permitted the withdrawal of $6,600.00 by the attorney. Had the bank exercised due care it could have "flagged" the account of the attorney and refused to release any funds represented by the check until it had notice that such check had been paid. This it did not do and when it permitted a withdrawal of the funds represented by said check, it did so at its own risk and resulted in the loss which it sustained. Under the facts, we do not think the respondent was liable as an endorser of the check.

Appellant also seeks recovery based on the alternative theory that respondent has been unjustly enriched by appellant bank making payment on the worthless check in question, because such payment enabled Tommy Fields to pay respondent $1,000.00 in the form of a cashier's check. The testimony establishes that respondent did, in fact, receive a $1,000.00 cashier's check from Tommy Fields, he having purchased the same with funds traceable to the $7,000.00 worthless check. Respondent had previously loaned Fields $1,000.00 and said check

constituted repayment for such loan. Respondent offered uncontradicted testimony that such debt had existed between himself and Fields; that he had no knowledge of the facts and circumstances which eventually produced the $1,000.00 cashier's check; and he merely accepted a check to which he was legally entitled.

Restatement, Restitution, 1(a) speaks of unjust enrichment as follows: "A person is unjustly enriched if the retention of the benefit would be unjust." The respondent herein did not receive a benefit, *per se,* but only accepted repayment for money lent and any stigma of unjustness was similarly lacking, as respondent was legally and equitably entitled to receive and retain payment from Fields, his debtor. It is our conclusion that appellant's contention based upon unjust enrichment is without merit and recovery thereunder is denied.

Finally, the appellant alleges error on the part of the trial judge in his refusal to instruct the jury that "failure of a party to call a witness who has knowledge of the fact in issue creates a presumption that the testimony of such witness, if produced, would be unfavorable."

It is a well settled rule that if a party knows of the existence of an available witness on a material issue and such witness is within his control and if without satisfactory explanation he fails to call him, the jury may draw the inference that the testimony of the witness would not have been favorable to such party. This inference is especially applicable where the relationship of employer-employee exists between the parties. This statement is in accord with our holding in *Robinson v. Duke Power Company,* 213 S. C. 185, 48 S. E. (2d) 808.

If an inference is based upon the absence of a possible witness it must appear that the witness is in the "control" of the party and available. "Control" in this connection means only that the witness is in such relationship to the party that it is likely that his presence

could be procured. The word "available" is sometimes used with a meaning similar to "control" and is held not to mean merely available or accessible for service of compulsory process. 29 Am. Jur. (2d) Evidence, Section 180, at page 225.

Our court, in *Davis v. Sparks*, 235 S. C. 326, 111 S. E. (2d) 545, stated that where a party lacks "control" over a potential witness, the drawing of an adverse inference for failure to call such witness is improper. Appellant's contention can only succeed if it can be shown that respondent continued to exercise some degree of "control" over Tommy Fields, notwithstanding the fact that their manager-fighter relationship has ceased to exist. In considering this question, testimony was offered that the contractual relationship between the respondent and Fields no longer existed and respondent had sold Field's fight contract to a party in Florida. Respondent and Fields had no inter-dealings, either personal or business, prior to their entering into this contract and likewise this relationship terminated with the sale of the contract. We are of the opinion that the indispensable element of "control", while apparently present during the life of the said contract, was lacking at the time of this trial and, therefore, we find no error on the part of the trial judge in refusing the requested charge.

The exceptions of the appellant are overruled and the judgment of the lower court is,

Affirmed.

LEWIS, BUSSEY and BRAILSFORD, JJ., concur.

LITTLEJOHN, J., not participating.