# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

In the Matter of the Care and Treatment of Gilbert
Gonzalez, Petitioner.[1]

Appellate Case No. 2012-210606

---

## ON WRIT OF CERTIORARI TO THE COURT OF APPEALS

---

Appeal From Charleston County
The Honorable Deadra L. Jefferson, Circuit Court Judge

---

Opinion No. 27443
Heard February 4, 2014 – Filed September 3, 2014

---

## AFFIRMED AS MODIFIED

---

Appellate Defender LaNelle Cantey DuRant, of
Columbia, for Petitioner.

Attorney General Alan McCrory Wilson, Senior
Assistant Deputy Attorney General Deborah R.J. Shupe,
and Chief Deputy Attorney General John W. McIntosh,
all of Columbia, for Respondent.

---

[1] Gonzalez maintains his last name is Zubia but that it was erroneously entered as
Gonzalez when he was incarcerated. Both variations appear in the record.

**JUSTICE BEATTY:**  Gilbert Gonzalez was found by a jury to meet the definition of a sexually violent predator (SVP) under South Carolina's SVP Act, S.C. Code Ann. §§ 44-48-10 to -170 (Supp. 2013).  The Court of Appeals affirmed.  *In re the Care & Treatment of Gonzalez*, Op. No. 2012-UP-003 (S.C. Ct. App. filed Jan. 4, 2012).  On certiorari, Gonzalez contends the Court of Appeals erred in affirming his SVP status because the State inappropriately asserted during closing argument that the jury could draw an adverse inference at trial from the absence of a psychiatrist Gonzalez retained to perform an independent evaluation. We affirm as modified.

## I.  FACTS

The predicate for Gonzalez's referral to the SVP program was his convictions for offenses involving three young girls who were four, five, and six. Gonzalez pled guilty on June 4, 1985 to committing a lewd act on a minor for lifting up the skirt of a four-year-old and fondling her.  He was sentenced to nine months in prison.  Gonzalez was already on parole for another crime when he committed the lewd act offense.

On June 3, 1985, the day before his guilty plea to the above offense, Gonzalez fondled a five-year-old girl.  On April 28, 1986, while again out on bond, Gonzalez engaged in oral sex with a six-year-old girl, fondled her, and rubbed her genital area with his penis until he ejaculated.  On November 5, 1986, Gonzalez pled guilty to lewd act on a minor for the offense against the five-year-old and to criminal sexual conduct (CSC) with a minor in the first degree for the offense involving the six-year-old.  Gonzalez was sentenced to thirty years in prison on the CSC charge and a consecutive ten years in prison for the lewd act.

In January 2006, prior to Gonzalez's potential release, the multidisciplinary team found there was probable cause to believe Gonzalez was an SVP and referred the matter to the prosecutor's review committee.  *See* S.C. Code Ann. § 44-48-30(1)(a)-(b) (Supp. 2013) (defining an SVP as "a person who:  (a) has been convicted of a sexually violent offense; and (b) suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment").

The committee agreed with this finding and filed a petition in the circuit court for civil commitment proceedings.  The circuit court made a determination of

probable cause and appointed Dr. Pamela Crawford to perform a psychiatric evaluation of Gonzalez. The circuit court thereafter granted Gonzalez's request to have an independent psychiatric evaluation performed by Dr. Thomas V. Martin.

A trial was held in the circuit court in February 2009. Dr. Crawford testified on behalf of the State and stated that, after examining Gonzalez and reviewing all of the pertinent records in his file, she had diagnosed him as having pedophilia and an anti-social personality disorder.

Dr. Crawford stated that pedophilia cannot be cured, but part of controlling it is for the individual to recognize the condition and to learn specific ways to resist inappropriate conduct. Dr. Crawford testified that she had a real concern regarding Gonzalez's risk for reoffending because, although he pled guilty to three charges, he maintained he did not "recall" doing certain acts of a sexual nature with the victims, and he stated that his sexual misconduct was caused by an ex-girlfriend who had become angry with him and put a spell on him. She stated the only crime that Gonzalez clearly admitted to her was the CSC offense on the six-year-old, and her review of the laboratory data from SLED showed Gonzalez's semen was found in the vagina and vulva of that victim.

Dr. Crawford testified pedophilia is a "hard-wired sexual attraction to children" and that a person has to admit responsibility for past misconduct and must "be very, very motivated" to combat this predisposition in order to reduce the risk of committing future acts of sexual violence against very young children. Dr. Crawford additionally noted that Gonzalez "had four major disciplinary infractions" during his incarceration, which also indicated a propensity for violence and an inability to control his behavior, even when incarcerated. Dr. Crawford stated in her medical opinion Gonzalez met the criteria for designation as an SVP, and he was in need of long-term control, care, and treatment at a secured facility.

During his testimony, Gonzalez acknowledged that he had pled guilty to the offenses involving sexual misconduct, but he denied full responsibility as he variously contended that he did not commit the crimes or that he did not commit all of the elements of the crimes. Gonzalez repeatedly maintained that he had been under a spirit or spell that had been placed on him by an ex-girlfriend, or he had been overtaken by a "demon" of sexual perversion, which he was in the process of overcoming.

He stated Dr. Crawford was wrong when she testified that he had only admitted the third incident involving the CSC charge. Gonzalez testified that he did tell the four-year-old victim in the first incident to lift her dress up, but he insisted that he never placed his hands on her. He completely denied the second incident with the five-year-old, stating he "never did nothing to her, never did lay [his] hands on her." However, he acknowledged that he did commit the third offense involving CSC on a six-year-old.

Gonzalez's girlfriend, Pamela Donahue, testified that Gonzalez had admitted to her that he committed the CSC offense, but she echoed Gonzalez's statements about having spells placed on him. She said she believed this meant if the devil wanted someone to do something, he would "misguide" the person.

During closing arguments, both the State and Gonzalez invoked the missing witness rule, i.e., arguing that the jury could infer that a party's failure to call a particular witness meant the witness's testimony would have been unfavorable to that party. Specifically, as is relevant here, the State argued the jury could infer the absence of Gonzalez's independently retained expert, Dr. Martin, indicated that Dr. Martin's testimony would have been unfavorable to Gonzalez.

The jury found beyond a reasonable doubt that Gonzalez met the statutory definition of an SVP. The circuit court ordered Gonzalez to begin involuntary civil commitment for long-term control, care, and treatment in the SVP treatment program administered by the South Carolina Department of Mental Health. In affirming Gonzalez's appeal, the Court of Appeals cited precedent holding the control of closing arguments rests in the circuit court's discretion, and it found the circuit court did not abuse its discretion because the State's closing argument was based on matters within evidence and the reasonable inferences arising therefrom. *In re the Care & Treatment of Gonzalez*, Op. No. 2012-UP-003 (S.C. Ct. App. filed Jan. 4, 2012), slip op. at 2. This Court granted Gonzalez's petition for a writ of certiorari to consider the propriety of the State's closing argument.

## II. STANDARD OF REVIEW

"In an action at law, on appeal of a case tried by a jury, the jurisdiction of the appellate court extends merely to the correction of errors of law." *Carson v. CSX Transp., Inc.*, 400 S.C. 221, 229, 734 S.E.2d 148, 152 (2012).

"A trial court is allowed broad discretion in dealing with the range and propriety of closing argument to the jury." *O'Leary-Payne v. R.R. Hilton Head, II, Inc.*, 371 S.C. 340, 352, 638 S.E.2d 96, 102 (Ct. App. 2006); *see also State v. Charping*, 333 S.C. 124, 508 S.E.2d 851 (1998) (stating the trial court must exercise its discretion as to whether to permit comment on a missing witness).

"An abuse of discretion occurs when the trial court's ruling is based on an error of law or, when grounded in factual conclusions, is without evidentiary support." *Clark v. Cantrell*, 339 S.C. 369, 389, 529 S.E.2d 528, 539 (2000). To warrant reversal, an appealing party must demonstrate not only error, but also prejudice. *Id.* at 390, 529 S.E.2d at 539.

## III. LAW/ANALYSIS

On appeal, Gonzalez asserts the Court of Appeals erred by affirming the trial court's ruling allowing the State to argue during its closing that the jury could draw a negative inference from the fact that Gonzalez's expert did not testify at trial.

During cross-examination, the State asked Gonzalez if he had obtained a second, independent evaluation after being seen by Dr. Crawford. Defense counsel objected, and a discussion was held at the bench, out of the jury's hearing. The contents of the objection were not placed on the record. Upon resuming, however, the State repeated its question and Gonzalez answered that he did obtain a second evaluation. The State then asked if he was evaluated by Dr. Tom Martin and if he recalled if it occurred in October 2006, and Gonzalez said that was correct. The State did not ask Gonzalez about the results of the evaluation, and no further questioning occurred on this subject.

After the State rested its case, defense counsel inquired whether the State intended to draw a negative inference from the absence of Gonzalez's expert at trial. The State indicated that it did. The circuit court stated, "I think he is entitled to ask him if he has been evaluated. Now the rest of it goes to how he argues it to the jury. You can always draw a negative inference from a witness not being called." During closing, the State told the jury that Gonzalez was entitled to get an independent evaluation and he had obtained one from Dr. Martin. The State then argued: "Dr. Martin is not here. [The State] would submit to you that you can draw an inference from his not being here that if he was here his testimony would be adverse to [Gonzalez's] case."

Following the jury's verdict, defense counsel moved for a new trial based, in part, on the State's adverse inference argument regarding Dr. Martin. The circuit court denied the motion.

To address the propriety of the missing witness rule here, we begin with a historical overview of the rule. Although it has been stated with some variations, it has long been the general rule in South Carolina that if a party fails, without satisfactory explanation, to produce the testimony of an available witness on a material issue in the case and the evidence is within his knowledge, is within his power to produce, is not equally accessible to his opponent, and is such as he would naturally produce if it were favorable to him, it may be inferred that such testimony, if presented, would be adverse to the party who fails to call the witness. *See, e.g., Davis v. Sparks*, 235 S.C. 326, 111 S.E.2d 545 (1959). The rule is often referred to by the courts as the "missing witness rule," the "absent witness rule," or the "empty chair doctrine," and modern cases describe this principle as a permissible inference, not a presumption. *See* Alan Stephens, Annotation, *Adverse Presumption or Inference Based on a Party's Failure to Produce or Examine Witness with Employment Relationship to Party—Modern Cases*, 80 A.L.R.4th 405, 415 nn.10 & 11 (1990 & Supp. 2014).

The rule is based on the premise "that a party's failure to rebut evidence that the party naturally would be able to refute, through testimony or physical evidence, may warrant an inference that such evidence either does not exist or would be unfavorable." *In re Samantha C.*, 847 A.2d 883, 910 (Conn. 2004). "The fact that the unfavorable inference may be drawn does not require that the jury draw it." *Baker v. Port City Steel Erectors, Inc.*, 261 S.C. 469, 476, 200 S.E.2d 681, 683-84 (1973). The rule has been applied in both civil and criminal cases, and it has been implemented as either a jury argument by counsel or a jury instruction by the trial court, or both. Stephens, *supra*. It has also been applied to non-testifying experts, including physicians. *See generally* Alan Stephens, Annotation, *Adverse Presumption or Inference Based on Party's Failure to Produce or Question Examining Doctor—Modern Cases*, 77 A.L.R.4th 463 (1990 & Supp. 2014).

Early South Carolina cases stated the principle in fairly simple terms, with further details as to its parameters being added over time. In *State v. Charping*, 333 S.C. 124, 508 S.E.2d 851 (1998), for example, the Court remarked that it had previously recognized that a party should not be prejudiced by his failure to call a witness who is "equally available" to the other party:

This Court has previously stated "it is always proper for an attorney in argument to the jury to point out the failure of a party to call a witness." *State v. Hammond*, 270 S.C. 347, 356, 242 S.E.2d 411, 415 (1978). *See also State v. Bamberg*, 270 S.C. 77, 240 S.E.2d 639 (1977) (comment on failure to produce witness permissible); *State v. Cook*, 283 S.C. 594, 325 S.E.2d 323 (1985) (no error in allowing solicitor to comment on defendant's failure to produce his wife); *State v. Shackelford,* 228 S.C. 9, 88 S.E.2d 778 (1955) (not improper for prosecutor to comment upon defendant's failure to produce witnesses, accessible to the accused, or under his control, whose testimony would substantiate his story).

However, in *Davis v. Sparks*, 235 S.C. 326, 333, 111 S.E.2d 545, 549 (1959), we recognized the general rule that "a party is not to be prejudiced by his failure to call a witness who is equally available to the other party." *Citing* 20 Am.Jur. 193 *Evidence, § 189.*

*Id.* at 128, 508 S.E.2d at 853 (footnote omitted).

This Court has also discussed the factor of "control," which is sometimes used with a meaning similar to "available":

If an inference is based upon the absence of a possible witness it must appear that the witness is in the 'control' of the party and available. 'Control' in this connection means only that the witness is in such relationship to the party that it is likely that his presence could be procured. The word 'available' is sometimes used with a meaning similar to 'control' and is held not to mean merely available or accessible for service of compulsory process.

*Duckworth v. First Nat'l Bank*, 254 S.C. 563, 576-77, 176 S.E.2d 297, 304 (1970) (citing 29 Am. Jur. 2d *Evidence*, § 180, at page 225). The element of control is judged at the time of trial. *See id.* at 577, 176 S.E.2d at 304 (holding where the witness was an employee of a party at the time of a contract but was not employed at the time of trial, the witness was no longer in the control of the party).

"Generally, the [missing witness] rule is applied when the uncalled witness is an agent, employee, relation, or associate of the party failing to call him, *or within some degree of control of said party*." *Davis*, 235 S.C. at 333, 111 S.E.2d at

549 (emphasis added). Moreover, the unfavorable inference may be drawn only from a party's failure to call an available, material witness where under all the circumstances, the failure to produce such witness creates suspicion of a willful attempt to withhold competent evidence. *Baker*, 261 S.C. at 475-76, 200 S.E.2d at 683. A party need not produce every witness who might testify in his favor, and a failure to do so does not necessarily imply an attempt on his part to suppress the truth. *Davis*, 235 S.C. at 334, 111 S.E.2d at 549. "Such suspicion is generally held not warranted where the material facts assumed to be within the knowledge of the absent witness have been testified to by other qualified witnesses." *Id.* "Requiring a party to call all previously disclosed expert witnesses would unnecessarily prolong the trial and unnecessarily increase expenses." *Wilkerson v. Pittsburgh Corning Corp.*, 659 N.E.2d 979, 984 (Ill. App. Ct. 1995).

Invoking adverse inferences due to missing witnesses has been the subject of much debate. Some commentators, such as McCormick, have questioned whether the rule's usefulness has been outlived. In *O'Rourke on Behalf of O'Rourke v. Rao*, 602 A.2d 362 (Pa. Super. Ct. 1992), the court discussed the waning need for the missing witness rule in light of modern discovery rules:

> Despite the plenitude of cases recognizing the inference, refusal to allow comment or to instruct does not often serve as a ground for reversal. This counsel of caution is reinforced by several factors. Possible conjecture of ambiguity of inference is often present. The possibility that the inference may be drawn invites waste of time in calling unnecessary witnesses or in presenting evidence to explain why they were not called. Failure to anticipate that the inference may be invoked entails substantial possibilities of surprise. And finally, the availability of modern discovery and other disclosure procedures serves to diminish both the justification and the need for the inference. For some or all of these reasons and others, recognition of the inference may well be disappearing.

*Id.* at 363-64 (quoting *McCormick on Evidence* § 272 (3d ed. 1984, 1987 pocket part) (footnotes omitted)); *see also Routh v. St. John's Mercy Med. Ctr.*, 785 S.W.2d 744, 747 (Mo. Ct. App. 1990) (observing the rule pre-dates modern discovery rules, which would make the use of an adverse inference unnecessary, and its application "has presented continuing difficulty to the courts").

The missing witness rule is based on dictum in *Graves v. United States*, 150 U.S. 118 (1893).[2] *See* Robert H. Stier, Jr., *Revisiting the Missing Witness Inference -- Quieting the Loud Voice from the Empty Chair*, 44 Md. L. Rev. 137, 138-39 (1985) (noting the historical significance of the *Graves* case as the basis for the rule). In *Graves*, the Court ultimately rejected its application under the circumstances there, which involved the absence of the defendant's wife, a potential witness to the offense, from the defendant's murder trial, since the Court found she was incompetent to testify against her husband. *Id.* at 138 n.3.

In *Baker v. Port City Steel Erectors, Inc.*, Justice C. Bruce Littlejohn, in a concurring opinion, stated "[t]he rule came into being through the common law," and he suggested "eliminating it as a matter of common law." 261 S.C. at 477, 200 S.E.2d at 684. Justice Littlejohn observed that the rule creates more problems than it solves and permits a jury to speculate on what the evidence in the case *might have been*:

> I have many misgivings as to the wisdom of continuing the rule that when a party fails to produce the testimony of an available witness who is within some degree of control of the party, it may be inferred that the testimony of such witness, if presented, would be adverse to the party who failed to call the witness.
>
> After almost 25 years on the trial and appellate bench, I have found that the rule is subject to much mischief and perhaps causes more problems than it helps to solve. Application of the rule suggests to a juror that he may speculate as to what an available, but non-testifying witness would say.

*Id.*; *see also Crum v. Ward*, 122 S.E.2d 18, 26 (W. Va. 1961) (remarking, in another context, that although "wide latitude and freedom of counsel in arguments to a jury are and ought to be allowed, we have never held that such arguments may be based on facts not in the record, or on inferences based on, or drawn from, facts which are not even admissible" and "[t]o permit such arguments would . . . disturb . . . well known rules of . . . procedure").

---

[2] The Court stated, "The rule, even in criminal cases, is that, if a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction, the fact that he does not creates the presumption that the testimony, if produced, would be unfavorable." *Graves*, 150 U.S. at 121.

In this case, there is no indication in the record that Gonzalez tried to suppress or conceal the testimony of Dr. Martin, which is a necessary predicate to allowing an adverse inference argument. *See Baker*, 261 S.C. at 475-76, 200 S.E.2d at 683 (stating an unfavorable inference may be drawn only where the failure to produce a witness creates suspicion of a willful attempt to withhold competent evidence). The failure to call a witness does "not justify an arbitrary presumption of suppression of evidence." *Parentini v. S. Klein Dep't Stores, Inc.*, 228 A.2d 725, 727 (N.J. Super. Ct. App. Div. 1967) (citation omitted). "The court must assess the nonproduction of a witness with a view to the person and testimony involved." *Id.*

In addition, due to the complexities of a psychiatric evaluation, it is not proper to assume Dr. Martin's diagnosis would only have been one of two results. As the court in *Parentini* observed, "We do not think it is proper to assume that normally a psychiatric opinion must support one of two opposite contentions; the opinion may lie somewhere in between, or go off in an entirely different direction." *Id.* at 727-28. The court concluded that, at best, the jury in that case could have concluded that the defendant's nonproduction of the expert witness indicated that his testimony would not have specifically contradicted the plaintiff's experts, and that it would not have materially aided his defense, but there was no basis for an assumption that the absent witness's testimony would have been favorable or unfavorable to anyone. *Id.* at 728.

Gonzalez had no obligation to produce medical evidence at trial, and the fact that he exercised his right to obtain an independent examination should not confer such an obligation upon him at trial. *Cf., e.g., Knotts v. Valocchi*, 207 N.E.2d 379, 382 (Ohio Ct. App. 1963) ("Defendant was free to accept or dispute plaintiff's medical evidence. He had no obligation to produce a doctor at trial, nor did the fact that he exercised his right of medical examination before trial fasten such obligation upon him. Therefore, he could not be called upon to answer for the absence of such a witness or his failure to call him.").

An expert's opinion is based on a myriad of facts and data, which may or may not be admissible in evidence, as well as the expert's analysis. *See* Rule 703, SCRE ("The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence."). Particularly as to a non-testifying psychiatric expert,

it is inherently difficult to assume that his opinion must have been one of only two options.

The application of an adverse inference as to these types of experts allows a jury to simply *speculate* as to what the expert might have said. In our view, an adverse inference is not appropriate for psychiatric experts, as the expert's opinion about the psychiatric condition of an individual is based upon numerous complex factors that do not readily lend themselves to being reduced to a discrete position, as compared to a fact witness. *See Parentini*, 228 A.2d at 727-28.

Because of the risk of unfairness that such adverse inferences could impose, we hold today that a party's invocation of the missing witness rule should be limited to *fact* witnesses, and it should not be applied to *opinion* witnesses, particularly psychiatric experts. Moreover, we reiterate that the fact witness must be under the control of the party failing to call him. Control in this context is now expressly defined to mean the uncalled witness is an agent, employee, relation, or associate of the party failing to call him. This is a more definitive statement of the categories of persons subject to control than is stated in our existing precedent, and it should reduce uncertainty on this point. *Cf., e.g., Davis*, 235 S.C. at 333, 111 S.E.2d at 549 (noting control refers to the fact that the uncalled witness "is an agent, employee, relation, or associate of the party failing to call him, or within some degree of control of said party").

In addition, because a jury instruction "carries with it the imprimatur of a judge learned in the law" and, therefore, usually has more impact on a jury than the arguments of counsel, *Dansbury v. State*, 1 A.3d 507, 522 (Md. 2010), we hold the better practice is that use of the missing witness rule should be limited to counsel's argument, and a jury instruction on the matter should not be given. *See, e.g., In re Samantha C.*, 847 A.2d 883, 889 (Conn. 2004) (finding public policy reasons support a conclusion that jury instructions should not be given regarding the missing witness rule).

Having found error in the State's adverse inference argument, we must next consider whether it constitutes reversible error. A fundamental principle of appellate procedure is that a challenged decision must be both erroneous and prejudicial to warrant reversal. *Ardis v. Sessions*, 383 S.C. 528, 682 S.E.2d 249 (2009); *see also State v. Charping*, 333 S.C. 124, 508 S.E.2d 851 (1998) (confirming a ruling on a party's ability to comment on a missing witness is subject to a harmless error analysis). "No definite rule of law governs this finding; rather,

the materiality and prejudicial character of the error must be determined from its relationship to the entire case." *Judy v. Judy*, 384 S.C. 634, 646, 682 S.E.2d 836, 842 (Ct. App. 2009) (citation omitted). "Error is harmless where it could not have reasonably affected the result of the trial." *Id.*

We find any error in this case is harmless beyond a reasonable doubt because it could not have reasonably affected the result reached by the jury. As an initial matter, we note Gonzalez's argument on appeal to this Court focuses exclusively on the propriety of closing argument, and he does not set forth an issue challenging the State's cross-examination of Gonzalez about a second evaluation.[3] Once the existence of a second evaluation was before the jury during cross-examination, any adverse inference arguably arose at that time, so the explicit suggestion of an adverse inference by the State in its closing argument was merely cumulative. *See Price v. United States*, 531 A.2d 984, 993 (D.C. 1987) ("By pointing out a witness' absence, counsel is plainly suggesting that if that witness were produced the resulting testimony would be adverse to the other party."). In any event, the State did not elicit any details about the evaluation on cross-examination other than the name of the examiner (Dr. Martin) and the date when the evaluation was performed.

In addition, defense counsel strenuously rebutted the adverse inference by arguing to the jury in his closing that *the State* could have called Dr. Martin if it believed his testimony would be helpful to the State. Defense counsel also invoked the missing witness rule as to other witnesses, arguing the State had failed to call several experts, so it could be inferred that their testimony would not help the State.

---

[3] The circuit court's statements at trial regarding balancing the probative value and the prejudicial effect of the evidence pertained to the admission of Gonzalez's testimony during cross-examination. The South Carolina Rules of Evidence govern the admission of this evidence. *See In re the Care & Treatment of Corley*, 353 S.C. 202, 577 S.E.2d 451 (2003) (discussing the SCRE, particularly Rules 401 and 403, in an SVP matter); Rule 403, SCRE ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ."). In contrast, however, "[a]rguments made by counsel are not evidence." *S.C. Dep't of Transp. v. Thompson*, 357 S.C. 101, 105, 590 S.E.2d 511, 513 (Ct. App. 2003).

Considering the entire record, we find these exchanges did not measurably affect the decision of the jury.  The State set forth an abundance of evidence as to Gonzalez's mental abnormality based on Dr. Crawford's diagnosis of Gonzalez as having pedophilia and an anti-social disorder, as well Gonzalez's risk of reoffending and inability to control his actions based on the fact that he continued to commit offenses while out on bond and based on his steadfast refusal, or inability, to accept responsibility for his conduct.  Gonzalez attempted to dilute the significance of this evidence by referring to examinations he had years earlier by other individuals.  The State, however, rebutted this evidence by asserting these examinations were not recent and were not made in the context of evaluating his status as an SVP.

In the end, the determination whether the evidence indicated Gonzalez was an SVP was one to be made by the jury as the fact-finder, and the very brief reference to a second evaluation could not reasonably have affected the outcome here.  If anything, Gonzalez's failure to fully acknowledge his prior sexual misconduct despite his guilty pleas to the offenses, and his unusual attempt to cast the blame for his sexual contact with children on a "spell" cast by an ex-girlfriend or on "spirits" or "demons," probably did more than any passing reference to a second evaluation to convince the jury that he was at a risk to reoffend if he did not receive long-term control, care, and treatment in a secure facility.

## IV.  CONCLUSION

The decision of the Court of Appeals upholding Gonzalez's SVP status and his involuntary commitment is affirmed as modified.

**AFFIRMED AS MODIFIED.**


**TOAL, C.J., KITTREDGE and HEARN, JJ., concur. PLEICONES, J., concurring in result only in a separate opinion.**

**JUSTICE PLEICONES:**  I agree that the trial judge erred in permitting the State to invoke the "missing witness" rule, and that its error was harmless.  I write separately because I do not join the portion of the majority opinion that would bar the application of the rule to *any* missing *opinion* witness.  Instead, I would narrow our holding to address the issue in this case:  whether the State should be allowed to invoke the rule against a SVP defendant who fails to call an examining psychiatric witness.

In every SVP proceeding, the key issue is whether the person "suffers from a mental abnormality or personality disorder that makes the person likely to engage in acts of sexual violence if not confined in a secure facility for long-term control, care, and treatment."  *See* S.C. Code Ann. § 44-48-30(1)(b) (Supp. 2014).  The State must prove beyond a reasonable doubt that a SVP defendant's mental state is such that it warrants indeterminate civil commitment.  The State meets that burden in part by procuring an evaluation of the SVP defendant's mental state and by having the expert testify as to the SVP defendant's likelihood of reoffending.  Given the quasi-criminal characteristics of SVP proceedings and the fact that the State bears the burden of proof, I would prohibit the State from *ever* invoking the missing witness rule when a SVP defendant chooses not to call a psychiatric witness.

I would not use this case as the vehicle to decide the broader question:  whether we should prohibit the use of the missing witness rule when a party fails to call an expert.  Further, it is not necessary to a decision of this case to adopt a new rule for "control" in the context of invoking the missing witness rule for fact witnesses.  Therefore, I cannot agree with the majority's definition of control as I fear the definition unnecessarily limits the viability of the rule for fact witnesses.

I also write separately to express my disagreement with the majority's analysis of Rule 403, SCRE.  Since I would prohibit the State from invoking the rule in a SVP proceeding when a defendant chooses not to call a psychiatric expert, I see no need to engage in a Rule 403 analysis.  Further, I see no need to distinguish between invoking the missing witness rule during cross-examination or closing argument because I would find the State should be foreclosed from *ever* invoking the rule in the SVP context.

Ultimately, I agree with the majority that the trial judge's error was harmless because there is overwhelming evidence to support the jury's determination. For the reasons stated herein, I therefore concur in result only and would affirm the Court of Appeals' decision as modified.